UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re:<br><br>RICK ALAN DAVIDSON,<br><br>                  Debtor. | Chapter 11<br><br>Case No. 19-11486 (SMB)<br><br>Honorable Stuart M. Bernstein |
| RICK ALAN DAVIDSON,<br><br>                  Plaintiff,<br><br>v.<br><br>JEFFERIES, LLC and JEFFERIES GROUP, LLC,<br><br>                  Defendants. | Adversary Proceeding No.: 19-<br><br><br>**COMPLAINT** |

COMES NOW, RICK ALAN DAVIDSON, Debtor and Debtor-in-Possession ("Davidson"), by and through his proposed special counsel, The Law Offices of Neal Brickman, P.C., and as and for his Complaint against JEFFERIES, LLC and JEFFERIES GROUP, LLC (collectively "Jefferies") states and alleges as follows:

**<u>NATURE OF THE CASE</u>**

1.     This action is for fraudulent inducement, breach of contract, defamation, tortious interference with contractual relations and prospective economic advantage, unjust enrichment, turnover of property of the estate, breach of the covenant of good faith and fair dealing, and subordination of claim. These claims all arise in connection with Davidson's recruitment by, short-lived employment with, and improper and malicious ouster from, Jefferies. Jefferies lied to Davidson to induce him to leave his lucrative and secure position at Morgan Stanley, where he had

been for eight (8) years, to join Jefferies' nascent Wealth Management Division. The representations made by Jefferies, upon which Davidson relied in accepting employment with Jefferies and moving his business to it, were knowingly untrue. In contrast, once employed, Davidson delivered on each of his pre-employment promises, transferring into Jefferies, from Morgan Stanley, nearly his entire "book of business," consisting of approximately $230 million in assets to be managed. During his first few months of employment, Davidson exceeded his first year's production target, entitling him, pursuant to the terms of his written Employment Agreement (the "Agreement"), to an incentive bonus payment of $1,168,750.00. Jefferies has, to date, failed and refused to pay Davidson that incentive bonus payment.

Instead, Jefferies manufactured bogus, personal stylistic, non-securities, non-compliance related, reasons to terminate Davidson's employment. It unlawfully prohibited Davidson from communicating with his clients and contacted each of them with a scripted message defaming Davidson, all with the intent to convince those clients to terminate their relationship with Davidson and to, instead, allow Jefferies to manage their money. Jefferies sought to accomplish this theft by defaming Davidson to his clients, including his longtime, live-in girlfriend, his mother, and his brother, and by unlawfully attempting to prohibit Davidson from communicating with those clients, who expected to hear from Davidson on a near daily basis. As a direct and proximate result of Jefferies treachery, Davidson was able to retain management of only $110 million of the $230 million of assets he had previously controlled. This permanently damaged and impaired Davidson's career, his earnings, and his earning capacity and unjustly enriched Jefferies in an amount to be determined at trial, but in no event, less than $15 million.

## PARTIES

2.    Davidson is an individual residing in Miami Beach, Florida. On May 7, 2019 Davidson filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York; Case No. 19-11486. Davidson is a financial advisor/broker with more than 33 years of experience in the financial services industry. In his long and distinguished career prior to joining Jefferies, Davidson had only been employed by three top tier broker/dealers. Davidson developed a remarkably loyal client base, many of whom have been with him for decades.

3.    Jefferies, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Jefferies is, and, at all times relevant to this matter was, a broker dealer, registered as such with the United States Securities and Exchange Commission (the "SEC"). Jefferies, LLC is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA").

4.    Jefferies Group, LLC is the sole member of Jefferies, LLC and a creditor of Davidson, as the holder of a Promissory Note executed by Davidson in connection with this employment with Jefferies, LLC.

## JURSIDICTION AND VENUE

5.    This is an adversary proceeding filed pursuant to Federal Rule of Bankruptcy Procedure 7001 and sections 510, 541, 542 and 543 of title 11 of the United States Code (the "Bankruptcy Code").

6.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C sections 157 and 1334 and sections 510, 541, 542 and 543 of the Bankruptcy Code.

7. Certain of the claims herein constitute core proceedings pursuant to 28 U.S.C. Section 157 (b) (2) (A), (B), (E) and (O). To the extent that any of the claims asserted herein are determined not to constitute core proceedings, such claims are otherwise related to Davidson's bankruptcy case and, thus, this Court may hear same pursuant to 28 U.S.C. section 157(c)(1). Davidson consents to the entry of final orders and judgments with respect to said claims by this Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

8. Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. sections 1408 and 1409.

## **FACTUAL BACKGROUND**

9. Davidson was an extremely successful financial advisor, with a decade's long history of outstanding performance. Since graduating from college, Davidson worked at three of the industry's most iconic broker dealers, including Donaldson, Lufkin & Jenrette and its successor Credit Suisse (for over 20 years), and Morgan Stanley (8 years), all top tier firms. By 2016 Davidson had built a remarkable book of business, with over $230 million in assets under management. He spoke to many of his clients nearly every day and, in return, they exhibited a dedicated loyalty to him, following him when he changed firms, regardless of the tedious paperwork required. Because of his unique relationship with his long-time clients, in the event that Davidson did not speak to, or otherwise communicate with, them for any prolonged period of time, his silence would raise red flags to them, signaling that something was terribly wrong. He was named as one of Barron's Top 100 Financial Advisors for several years running.

**Jefferies Recruitment of Davidson:**

10. Davidson's business focused on high net worth families and he specialized in fixed income and structured products. However, Davidson worked with many different asset classes, including fixed income, equity management and total risk exposure.

11. In or about late March/early April of 2016, Frank Scheuer, then Chief Operating Officer of Wealth Management at Jefferies, recommended Davidson to Michael Armstrong, then Jefferies' Global Head of Wealth Management. Scheuer and Davidson were colleagues earlier in their careers at Donaldson, Lufkin & Jenrette ("DLJ") and at its successor, Credit Suisse ("CS"). In fact, when DLJ was bought out by CS, Davidson was assigned to manage Scheuer's personal accounts for some 20 years. Scheuer was intimately familiar with Davidson's book of business, his support needs, and the manner in which Davidson conducted his business. For years, Scheuer told Davidson that Jefferies' retail business was not mature enough to handle Davidson's business. However, once Armstrong was a more established presence at the firm, Scheuer advised Davidson that the time for him to join Jefferies had come. Scheuer explained that Armstrong was now armed with a "checkbook" and that he was poised to make Jefferies "another DLJ." Scheuer assured Davidson that Armstrong had firm-wide support to build its non-existent retail business so that it would compliment its already strong investment bank.

12. At or about this time, Jefferies' Wealth Management Division was struggling. It had experienced enormous turn over, it was having trouble attracting significant assets to manage, and it was losing money. Jefferies aggressively recruited Davidson in an attempt to prop-up its struggling division.

13. Jefferies conducted a deliberate, exhaustive and in-depth review of Davidson, the nature of his book of business, and his manner and method of operation. It reviewed his FINRA

registration documents and all disclosures reported to FINRA and to the public by his previous employers. They engaged in prolonged discussions with Davidson regarding his unique book of business, how he operated, what support/systems he needed to properly service his accounts, and how he had been, and would be, supervised.

14.     As part of this review Davidson was asked to produce, and willingly produced, the following documents and information to Jefferies for its review and analysis: (i) four years of his trailing 12 months commissions; (ii) three years of his AUM; (iii) three years of his business mix; (iv) numbers of clients; and (v) his clients' allocation of business.

15.     The vetting of Davidson extended for over two months, during which Davidson met with and discussed all of the above with, among others, Scheuer, Armstrong, Ron Filipowicz, Head of Compliance, Jeff Low, Senior Compliance Officer, and eight of the ten department heads.

16.     During his recruitment, Jefferies, by and through its senior executives and department heads, made the following promises and representations to Davidson:

        a.  That Jefferies had the capacity, automated trading, and confirmation systems to handle the size and uniqueness of Davidson's book of business;

        b.  That Jefferies intended to grow – and had a concrete plan in place to grow – its retail division of wealth management, which was critical to Davidson's business;

        c.  That Davidson would be provided a private space so that he could meet with his clients to discuss strategy, pitch prospective clients, and have privacy to allow him to conduct business over the telephone. In fact, Davidson was presented with actual architectural plans showing a planned build-out of a new space for the retail group on a different floor;

d. That Michael Armstrong was committed to the organization, had no plans to leave, and would be Davidson's manager and direct supervisor;

e. That Davidson would be allowed to buy and sell, for his clients, structured products that Jefferies underwrote, and that Jefferies understood that the purchase and sale of these structured products was the core of Davidson's business;

f. That Jefferies had vetted Davidson with his prior employers and FINRA and was satisfied, from those third-party sources, that Davidson had no compliance or regulatory issues that would impede his being hired by Jefferies; and

g. That Jefferies' compliance department, senior management in the Division, and the other department heads, were supportive of Davidson's being hired and understood the needs of his business.

17.     In reliance upon these representations, on or about May 17, 2016, Davidson accepted a position with Jefferies and signed a written Employment Agreement (the "Agreement"). Pursuant to that written Employment Agreement Davidson was hired as a Managing Director in the Wealth Management Division. He started at Jefferies that very day. But for these representations, Davidson would not have accepted employment with Jefferies.

**Jefferies Misrepresentations Come to Light:**

18.     On or about Davidson's first day of work, Michael Armstrong left Jefferies to pursue an opportunity at RBC Capital Markets ("RBC"). Armstrong must have been having conversations with RBC when he advised Davidson, in or about April of 2016, that he had no plans to leave and was committed to Jefferies. Due to Armstrong's sudden departure, Davidson had no manger for the first four months of his employment and was left to try to onboard his business

with no guidance or managerial support. Ron Filipowicz, Head of Compliance, was Davidson's "acting" manager during this period. With Armstrong's departure – announced in Advisor Hub on April 29, 2016, before Davidson even began his employment with Jefferies – all efforts to build up the retail unit ceased. Armstrong did not even advise Davidson of his departure and Davidson did not learn that Armstrong had left until a week after Davidson started at Jefferies.

19. Contrary to the explicit promises made to Davidson during the recruitment, Davidson was not provided a private space. Instead, he was made to sit at the end of a row on an active trading desk. The space allocated to Davidson and his team of sales assistants was extremely cramped, consisted of approximately four (4) feet of the desk to accommodate three people. None of the team could maintain any "personal space" as they were virtually seated on top of each other. The plan to build out new space for the retail division never even got started. Since clients were not allowed on the trading floor, Davidson had no readily available space to meet with his clients and prospective clients nor any privacy with which to conduct business by telephone. Upon information and belief, it is illegal and, at least, improper to allow a wealth advisor to sit on an active trading desk on a trading floor.

20. Moreover, once he was employed by Jefferies, Filipowicz advised Davidson that he was not permitted to buy or sell structured products that Jefferies underwrote, which was directly contrary to one of the promises made to Davidson to induce him to accept employment with Jefferies. The ability to buy and sell these structured products was a critical component of Davidson's business. Davidson challenged Filipowicz's instruction and escalated the issue directly to the structured products desk and other senior officers at Jefferies. After some delay, the senior officers at Jefferies countermanded Filipowicz's instructions and permitted Davidson to

buy and sell these structured products. By so doing, Davidson lost Filipowicz's support, who, thereafter, sought any justification to terminate Davidson's employment.

21.      At or about the same time, Davidson learned, contrary to the prior assurances he had received, that Jefferies did not have the automated computer software to support his structured product business. Instead, every trade had to be handwritten. This required an unnecessary expenditure of time and resulted in "TRACE" violations by his assistants and increased critical supervision by compliance. In addition, it became apparent that Jefferies did not have the technological, clerical, or institutional capacity to support or assimilate Davidson's business. Suzanne Folger, Davidson's sale assistant for 17 years, quit after her first day at Jefferies because of the critical lack of technological and institutional support available to onboard and service Davidson's clients. For example, while Davidson was feverishly attempting to on board his clients, Jefferies ran out of ACAT paper, the very paper needed to authorize assets to be transferred from Morgan Stanley to Jefferies. Moreover, Jefferies was still using an old Pershing software from the 1980s to record trades. This outdated software was deficient to handle the needs of any active retail division.

22.      Davidson also quickly learned that, in direct contradiction of the representations made to induce him to accept employment with Jefferies, there was no concrete plan, or any sort of plan, to grow the retail division of wealth management. In fact, there was no plan at all with respect to the retail division. It remained leaderless, directionless, and neglected. Once Armstrong left, Jefferies abandoned all pretense of even attempting to build out the retail division.

23.      Davidson also quickly learned that there had been no institutional "buy-in" with respect to his being hired. His employment was an isolated "one off", designed to inject assets

into an otherwise moribund division that was losing money and had no comprehensive plan to turn things around.

**Notwithstanding These Challenges, Davidson Meets or Exceeds his Performance Targets:**

24. Due to Ms. Folger's abrupt departure, Davidson was assigned Giselle Kahn, who had previously worked on the institutional side of the business, and, later, Debbie Deuel, as his new sales assistants. Ms. Folger could not deal with working on an active trading desk and attempting to deal with the chaos that permeated the leaderless retail division. Davidson had no say in this assignment. Kahn was a legacy employee, who had supported three senior brokers who had left Jefferies to work for RBC. Upon information and belief, these three brokers did not ask Kahn to join them, because of her poor work habits and toxic attitude. Kahn exhibited these same poor work habits and bad attitude working for Davidson. He immediately and repeatedly complained to Scheuer about her. No investigation of Kahn was ever done nor was there any corrective action ever undertaken. Kahn was the highest paid sales assistant at the firm, but was chronically late for work every day because of her need to receive physical therapy. Scheuer advised Davidson that because of Kahn's being a member of a "protected class," he would have to stick it out with her for a year, despite her dismal performance.

25. After joining Jefferies, Filipowicz was openly hostile to Davidson and began a campaign of singling Davidson out by, among other things, questioning every trade he made, threatening to fire him daily, restricting his commissions and subjecting him to public ridicule. Filipowicz was, unbeknownst to Davidson, assigned to "monitor Davidson's every move." He provided no direction or encouragement to Davidson and was not interested at all in helping to build out a robust retail presence.

26.     In late 2016, during one particular outburst, Filipowicz very publicly humiliated Davidson to the point of making him breakdown and cry. Filipowicz was angered by the TRACE violations but it was impossible to hand write large trades, time stamp each trade and walk over to institutional desk to have each trade manually inputted into the system in the 15-minute time period allotted by TRACE rules. All other brokerage firms Davidson was employed at had automated systems which would only take two minutes to complete large volume trades. Filipowicz was aware that the Jefferies system was deficient.

27.     In or about October 2016, Robert Peyreigne, newly appointed Head of Wealth Management, became Davidson's new manager. The first thing Peyreigne said to Davidson was, "I hear you are a bad guy." Peyreigne's statement again evidenced the bias Jefferies' had towards Davidson. Peyreigne did not even speak to Scheuer, his boss for near 2.5 months.

28.     Despite these challenges and the openly hostile environment with which he was confronted, Davidson exceeded all performance and production metrics set for him. He successfully onboarded all of his clients to Jefferies within six weeks. He brought over to Jefferies more than $230 million in new assets. In a matter of months, Davidson exceeded his first year's contractual production target of $3,506,250.00. In short, in a division that was losing millions of dollars, Davidson was responsible for making Jefferies millions of dollars of revenue. He was, by far, the biggest producer in this moribund business unit, generating revenue to Jefferies of more than, after deducting his compensation, $2.1 million in his first nine months of employment.

**The Scheme to Steal Davidson's Business and to Manufacture a Bogus Record to Justify his Ouster:**

29.     In August of 2016, a Letter of Warning was issued to Davidson, purportedly for bullying his sales assistant. To the best of Davidson's knowledge, Jefferies did not conduct an investigation and it never afforded him an opportunity to explain or give his version of events. In

fact, Jefferies was out to manufacture a record against Davidson and had no interest in conducting a fair investigation.

30.     In September 2016, Davidson received a second Letter of Warning for alleged inappropriate and retaliatory behavior involving these same sales assistants. Again, Davidson was not afforded an opportunity to defend himself – he received the letter before anyone asked him about the incident. The fact that Jefferies would issue two personnel conduct warning letters without seeking any input from Davidson further demonstrates its bias against him. These letters were written before Jefferies ever spoke to Davidson about these matters, indicating that Jefferies was intent upon building a false narrative to justify its plan to oust Davidson from the firm and attempt to steal his clients.

31.     Despite the serious allegations Jefferies set forth, Davidson did not receive any coaching, training or counseling regarding these incidents. If the warning letters were in fact anything other than a set-up, Jefferies would have followed them up with some corrective actions according to its personnel policies.

32.     In March 2017, Jefferies conducted an "investigation" into the treatment of Davidson's sales assistants. The investigation allegedly reveled that Davidson had spoken disrespectfully to and about colleagues, was aggressive and argumentative, intimidated staff by raising his voice and, in one instance, was inappropriately close by blocking one sales assistant's path with a chair. While all of the allegations were absurd and fanciful, the last allegation was, given the space Davidson and his team were assigned to work, an unavoidable circumstance.

33.     Once again demonstrating the Jefferies bias, Davidson was not interviewed during this purported investigation. Davidson has since learned that Kahn was reporting on Davidson's

every move to Filipowicz daily and Deuel was reporting everything that Davidson did at work to Human Resources daily. Neither sales assistant made any complaint directly to Davidson.

34. In addition, upon information and belief, the standard protocol at Jefferies is to separate a broker and sales assistant if there were issues between them. Davidson's sales assistant was not reassigned, nor, to the surprise of Jefferies' legal department, was that corrective action of separating Davidson from his disgruntled sales assistants ever even considered.

35. In May 2017, Jefferies supposedly conducted another investigation due to complaints from his sales assistant regarding Davidson's demanding nature and lack of respect for their personal space. As a result, Jefferies purportedly determined they had lost confidence and decided to part ways with Davidson. Davidson was told that he had a month to find another job. None of the complaints and allegations against Davidson involved improper sales practices, customer complaints, purported violations of security related laws, rules or regulations, or any type of gender-based harassment or discrimination. They were all related to personality clashes with his poor performing sales assistants regarding Davidson's style or manner.

36. Having met his annual benchmarks by March 30, 2017, just nine months after he joined, Davidson earned a $1,168,750.00 incentive bonus that was to be paid within 60 days of his meeting the Production Target. At the time the incentive bonus should have been paid, Davidson was in Good Standing, as evidenced, in part, by the fact that Jefferies continued to pay him his commissions. The same "Good Standing" requirement was necessary in order for Davidson to be eligible to receive those commissions.

37. In very early May 2017, Peyreigne instructed Davidson to pay bonuses to his two sales assistants out of his own pocket, and that he shouldn't worry because of the bonus he was going to receive shortly. Davidson understands now that Peyreigne told him to advance the bonus

payments knowing full well that Jefferies was not going to pay Davidson his bonus, and so Davidson would suffer twice. Peyreigne was motivated by pure personal animus.

38. On May 9, 2017, Peyreigne instructed Davidson not to come into the office and instructed Davidson not to speak to his clients. This was in furtherance of Jefferies' plans to "steal" Davidson's clients. Notwithstanding the fact that Jefferies handbook explicitly acknowledges Davidson's right to solicit these clients, Jefferies affirmatively sought to separate Davidson from his clients in order to force them to seek advice and wealth management services away from Davidson. Davidson was prohibited from speaking to his clients for a period of thirty (30) days. This raised red flags for these clients, who had grown used to hearing from Davidson on a near daily basis. Since most of these clients had been with him for decades and required extraordinary "hand holding," they immediately assumed that Davidson had engaged in some sort of financial misconduct. The lawyer for the Wealth Management division openly questioned why Davidson would be separated from his clients if there were no compliance or customer complaint issues involved. Even she recognized that Jefferies treatment of Davidson was unusual, unjustified, and punitive.

39. On May 17, 2017, Peyreigne told Davidson that his employment would end due to the repeated violations of the Jefferies' *Respect in the Workplace Policy*. Jefferies identified June 15, 2017 as Davidson's last day.

40. Davidson followed Jefferies instruction and June 15, 2017 was his last day of work with the firm. As a result of the Jefferies threats, Davidson was forced to accept employment at a brokerage house that did not enjoy the same reputation as Jefferies, a fact that damages him in the eyes of his clients.

41. In addition, Davidson never received his last paycheck.

14

**Jefferies Attempts to Extort Davidson:**

42.     Once Davidson knew his employment was ending, he retained an attorney who attempted to negotiate fair departure terms with Jefferies, but his attempts were rebuffed.

43.     The main focus of Davidson's departure was the $5,142,500.00 promissory note Davidson signed when he was hired. Davidson asked for patience while he searched for a new job and transferred his business in order to generate earnings to pay Jefferies back a fair amount. He also asked for credit for the bonus he had earned, among other things.

44.     It soon became apparent that Jefferies was not negotiating a good faith resolution.

45.     For example, Jefferies communicated through their attorneys that if Davidson did not agree to pay back the note in full, they would mark his U-5 to say he was fired for cause even though that was not the case.

46.     Davidson would not agree to these terms because: (i) he was owed over $1.1 million from Jefferies; (ii) he paid his sales assistant bonuses of approximately $100,000.00; (iii) lost clients and business due to his forced departure; and (iv) he made a $615,512.00 payment towards an outstanding balance on May 15, 2017 that Jefferies did not account for.

**Jefferies Defames Davidson:**

47.     Following Davidson's suspension, Ms. Kahn and Ms. Deuel, the same poor performing sales assistants who made inaccurate complaints about Davidson, were left to "service" his clients. During the period Davidson was told not to contact his clients, Jefferies instructed Ms. Deuel and Ms. Kahn to contact them and ask whether Jefferies could assist them with anything. These women were given a script and instructed to call every single one of Davidson's clients to attempt to get them to remain at Jefferies. Deuel acknowledged in one telephone call that she had "a script to follow, and that she didn't want to be fired too" for not following the script. Upon

15

information and belief, on multiple occasions during these phone calls, Jefferies representatives falsely advised Davidson's clients, including his girlfriend, his mother, and his brother that something negative had happened to Davidson's business and that Davidson was a "bad guy" who "could not be trusted" and who had "committed wrongs that justified his termination and threatened his license." In addition, when several of Davidson's clients called looking for him, Jefferies made other similar wrongful statements that raised questions about Davidson' character. Davidson's long-term relationships with many of his clients were unique. They counted on him to be available to them 24 hours a day, seven days a week. When he was not available to them, many of his clients assumed that Davidson had abandoned them and/or done something horribly wrong, perhaps resulting in his ban or suspension from the industry.

48.     Davidson secured re-employment, but as a result of the wrongful acts against him, Davidson's AUM dropped from approximately $230 million to $110 million – less than half what it was at Jefferies. Davidson's successful business was been severely impacted. The other $120 million of assets that Davidson had under management, remain at Jefferies, and it, not Davidson, continues to earn millions of dollars of commissions on those assets.

## AS AND FOR THE FIRST CAUSE OF ACTION

### (Fraudulent Inducement)

49.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "48" of this Complaint with the same force and effect as if fully set forth herein.

50.     Jefferies made material misrepresentations of existing facts to Davidson as detailed herein at Paragraphs "13" through "20". Jefferies knew these representations were false when they made them, and it made them in order to induce Davidson to accept employment with it and to induce him to transfer the accounts and assets he managed to Jefferies.

51. Davidson reasonably relied to his detriment upon the aforesaid misrepresentations in accepting employment with Jefferies and moving approximately $230 million in new assets to Jefferies' moribund Retail Wealth management Division. But for Jefferies' misrepresentations Davidson would have never accepted employment with Jefferies nor arranged for the transfer of his accounts, and the account assets, to Jefferies. Jefferies acknowledged that the Davidson deal was a "good deal" for Jefferies, particularly since it did not address the deferred compensation that Davidson forfeited when he left Morgan Stanley. The fact that Jefferies did not address Davidson's forfeited deferred compensation is indicative of the fact that it was never committed to Davidson for the long term in the first instance.

52. Jefferies' fraud has damaged Davidson. The damages he has suffered as a direct and proximate result of Jefferies' fraud consist of lost Morgan Stanley deferred compensation, lost wages, lost opportunity costs occasioned by his losing $120 million of assets under his management, diminution of his earning capacity, and extreme emotional pain and suffering.

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies for compensatory damages in an amount to be determined at trial, but in no event less than $15 million, punitive damages in an amount to be determined at trial, but in no event less than $30 million, together with interest, costs, including reasonable attorneys' fees, and such other and further relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Contract)

53. Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "49" of this Complaint with the same force and effect as if fully set forth herein.

54.     Davidson entered into a written contract with Jefferies dated May 13, 2016. Davidson signed that contract on May 17, 2016 and began his employment with Jefferies that same date. Pursuant to Paragraph 1C of that contract, if, prior to the first anniversary of his start date, Davidson's gross production at Jefferies reached $3,506,250.00, he would be paid an Incentive Bonus equal to $1,168,750.00. That Incentive Bonus was to be paid "no later than sixty (60) days after" Davidson reached the $3,506,250.00 Production Target.

55.     Davidson reached his first year's Production Target in or about the 1st quarter of 2017. He was due to be paid his Incentive Bonus on or before May 30, 2017. Davidson was in "Good Standing" on the date the Incentive Compensation should have been paid to him.

56.     Despite his several demands for payment, to date, Jefferies has failed and refused to pay him the Incentive Compensation he earned.

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies for compensatory damages of $1,168,750.00, together with interest from June 15, 2017 and such other and further relief as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Turnover of Property of the Estate)

57.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "56" of this Complaint with the same force and effect as if fully set forth herein.

58.     The Incentive Bonus and final paycheck earned by Davidson constitute property of the Debtor's estate pursuant to section 541 of the Bankruptcy Code.

59.     Section 542 or 543 of the Bankruptcy Code provide that Jefferies, the holder of the Incentive Bonus and paycheck, is required to turnover said property to the Debtor.

60.     Jefferies has refused and continues to refuse to turnover the Incentive Bonus and paycheck to the Debtor.

61.     Jefferies actions as aforesaid are in direct contravention of the provisions of the aforementioned provisions of the Bankruptcy Code.

WHEREFORE, Davidson respectfully requests that this Court enter an order granting him judgment against Jefferies in the amount of his Incentive Bonus plus interest from June 15, 2017, and granting such other and further relief as this Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Defamation)

62.     Davidson reappears and realleges each and every allegation contained in Paragraphs "1" through "61" of this Complaint with the same force and effect as if fully set forth herein.

63.     Jefferies, commencing May 7, 2017 and continuing, upon information and belief, on a nearly daily basis, through June 15, 2017, by and through its authorized agents, including Giselle Kahn and Debbie Deuel, falsely and maliciously advised Davidson's clients that he had engaged in inappropriate behavior, that he was a bad guy who would not be trusted, and that he had committed wrongs that justified his termination and that might cost him is securities licenses. These false and malicious words constitute defamation per se in that they impugned Davidson's honesty and integrity and implied that he had engaged in financial misconduct.

64.     As a direct and proximate result of this defamation, Davidson suffered damages including the lost earnings occasioned by Jefferies taking clients and approximately $120 million of assets that he previously managed from him.

19

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies from compensatory damages of not less than $9 million (supported by an experts Economic Loss Appraisal), punitive damages in an amount to be determined at trial, but in no event less than $18 million, together with interest, costs, including reasonable attorneys' fees and such other and further relief as the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Tortious Interference with Contractual and Prospective Economic Advantage)

65.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "64" of this Complaint with the same force and effect as if fully set forth herein.

66.     Davidson had a contractual relationship with, and a prospective economic benefit from, each of his clients for whom he provided wealth advisory services. In or about June of 2017 he managed some $230 million for these clients.

67.     Commencing in or about May 7, 2017 and continuing through and including June 15, 2017, Jefferies wrongly and improperly separated Davidson from these clients and refused to let Davidson talk or otherwise communicate with them. At that same time, Jefferies repeatedly defamed Davidson to these clients in an attempt to convince these clients to discontinue their retention of Davidson as their wealth advisor and, instead, to entrust Jefferies with their assets to manage.

68.     As a direct and proximate result of Jefferies' wrongful acts as detailed hereinabove, Davidson lost clients in favor of their using Jefferies. Davidson lost to Jefferies, because of the communication prohibition and the defamation, some $120 million of assets he was managing and the commissions that he would have earned on those assets.

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies for compensatory damages of not less than $9 million, punitive damages in an amount to be determined at trial, but in no event less thank $18 million, together with interest costs, including reasonable attorneys' fees and such other and further relief as the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

69.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "68" of this Complaint with the same force and effect as if fully set forth herein.

70.     By virtue of Davidson's bringing in $230 million of new assets to Jefferies to manage and it wrongfully retaining some $120 million of those assets to manage for which it receives commissions that would otherwise be due to him, Jefferies was unjustly enriched.

71.     Jefferies' enrichment, calculated to be in excess of $10 million, was at Davidson's expense. It deprived him of the earnings he would have received from managing those assets. The circumstances are such that in equity and good conscience Jefferies should return that benefit (i.e. its ill-gotten commissions on the wrongfully retained assets) to Davidson.

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies from compensatory damages in an amount to be determined at trail, no in no event less than $10 million, together with interest and such other and further relief as the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

72.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "71" of this Complaint with the same force and effect as if fully set forth herein.

73.     From the inception of Davidson's contractual relationship with Jefferies, Jefferies acted with malicious bad faith. It lied to him, manufactured bogus complaints about his performance, failed to properly support his business, refused to abide by its practices and procedures regarding separating advisors from disgruntled sales assistants, bad mouthed him, tarnished his reputation, attempted to poison him with his clients, wrongfully attempted to "steal" those clients, and blackmailed him with threats regarding reporting untruths on his Form U-5.

74.     In every contract, there is an implied covenant of good faith and fair dealing. Jefferies repeatedly breached that covenant vis-à-vis Davidson. As a direct and proximate result of Jefferies' breach of the covenant of good faith and fair dealing, Davidson was damaged. His damage consists of income he lost as a result of Jefferies wrongful actions, including past and future commissions.

WHEREFORE, Davidson respectfully requests that this Court enter an Order granting him Judgment against Jefferies for compensatory damages in an amount to be determined at trial, but in no event less than $15 million, punitive damages in an amount to be determined at trial, but in no event less than $30 million, together with interest, costs, including reasonable attorneys' fees, and such other and further relief as this Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Equitable Subordination of the Defendant's Claim Pursuant to 11 U.S.C. § 510(c)(1)

75.     Davidson repeats and realleges each and every allegation contained in Paragraphs "1" through "74" of this Complaint with the same force and effect as if fully set forth herein.

22

76.     Section 510(c)(1) of the Bankruptcy Code provides, in pertinent part:

> [A]fter notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .

11 U.S.C. § 510(c)(1).

77.     Jefferies has knowingly engaged in inequitable conduct by inducing Davidson to enter into an employment agreement under false pretenses, wrongfully terminating his employment, prohibiting him from communicating with his clients, wrongfully retaining his clients, and defaming him.

78.     The actions taken by Jefferies were a precipitating factor of Davidson's bankruptcy filing and resulted in injuries to creditors of Davidson, who, as a result thereof, may not receive timely and/or full payment of their claims.

**WHEREFORE**, Davidson respectfully requests that this Court enter an Order granting him Judgment determining that Jefferies claim should be subordinated to the claims of all other creditors of Davidson, awarding him costs, including reasonable attorneys' fees, and such other and further relief as this Court deems just and proper.

Dated: New York, New York
      July 22 , 2019

THE LAW OFFICES OF NEAL BRICKMAN, P.C.

Neal Brickman (NB 0874)
420 Lexington Avenue, Suite 2440
New York, New York 10170
(212) 986-6840
Neal@Brickmanlaw.com
*Proposed Special Counsel for Plaintiff,*
*Rick Alan Davidson*

23